ALEXANDER HENDRICKSON, Respondent, *v.* JACOB RICE, Doing Business under the Firm Name and Style of JACOB RICE & SONS, Appellant.

First Department, July 6, 1926.

**Master and servant — action to recover for injuries suffered by plaintiff when sliver of steel flew off chisel and struck plaintiff in eye — evidence shows that tool was not furnished by defendant and that defendant had proper tools at hand.**

In an action to recover damages suffered by the plaintiff from injuries to his eye caused by a sliver of steel which flew off the end of a chisel that he was using, which action was based on the negligence of the defendant in failing to furnish safe and proper tools to the plaintiff, the evidence establishes that the defendant had proper tools at hand but that the tool in question was one belonging to a coworkman of the plaintiff and did not belong to the defendant, and, therefore, the plaintiff is not entitled to recover.

APPEAL by the defendant, Jacob Rice, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 5th day of June, 1925, upon the verdict of a jury for $5,500.

*Theodore H. Lord* of counsel [*James B. Henney* with him on the brief; and attorney], for the appellant.

*Don R. Almy* of counsel [*Almy, Van Gordon & Evans*, attorneys], for the respondent.

CLARKE, P. J. The plaintiff was a barge captain employed by the defendant. He and another barge captain by the name of Seering were engaged in repairing barges that were laid up for the winter. It was necessary to split off some heavy bumpers on the side of a barge. Seering procured from his barge a piece of iron and a maul. Seering held the iron and Hendrickson, the plaintiff, hit it three or four times with the maul when a small sliver of steel flew off into his eye and destroyed the sight. He sued his employer for damages. It is claimed that the piece of steel which was used for splitting the bumpers off the barge was not a proper tool; that it was not a splitting chisel; that it was defective and unsafe in that the end upon which it was pounded was not soft steel but was hard steel, and, therefore, when hit with the maul, it chipped. The question at issue was whether the defendant had furnished this unsafe and improper tool. The principal witness for plaintiff, Seering, had made two written statements, one on March 14, 1921, and one on April 20, 1922, in both of which he said these tools were his own. In the first statement he said: " We had put a squaring piece on the port corner of the bow of the *Harry B. Peters* and were trimming it up, splitting a piece of it off with a splitting bar which was my own individual property, which I had had for a long time but I had ground the head of the tool smooth a few days before Hendrickson was injured. There were no broken places of the head of the splitting bar when we started to work with it that day. I was holding the bar and Hendrickson was striking it with a 5½ maul which was also mine. While he was striking the splitting bar a piece of the head of it flew off and struck him in the eye. I looked at the tool afterward but could not see where the piece had come from.   *   *   * I used this same splitting bar for a day or — it may have been a week afterward and had no trouble with it or the maul and then one day while I was using it, it slipped out of my hand and went overboard and I have not been able to recover it. There was no one on the boat *Harry B. Peters* but Hendrickson and myself at the time and there were no other witnesses."

In the statement of April 20, 1922, he said: " On February 15, 1921, Alex Hendrickson who was captain of the *Fred R.* and I were putting wooden oak sticks about 4 inches thick on the corners of the *Peters.* I was cutting the corners back on the deck and Hendrickson was bursting off the old corners.  The corners were held in place with iron bands spiked to the boat.  He was using a maul and a chisel bar.  After he had bursted off about four or five pieces of wood he came to me and said he had gotten something in his eye.  He went into his cabin and did no more work that day.  I bursted off the other pieces that he had not touched and finished the job.  I had not done any striking on the chisel when Hen.'rickson was working.  He placed it in position and struck on it himself while he was working.  No one but Hendrickson and I were doing any work on this boat then.  I used the same maul and chisel after the accident and nothing broke from either while I used them.  This chisel and maul were my own tools.  I had bought these tools about three months before the accident. The maul was 6 lb. steel one.  The chisel was about 20 inches long and $\frac{7}{8}$ in diameter.  It was steel and seemed well tempered. I don't recall when I bought it.  I have been using such tools for the past 45 years.  There was no sign that any slivers had bursted from the end of the chisel.  The maul was also in good order, we had none of the Rice Co. tools on this boat.  I did not see what happened to Hendrickson.  I could not see what was troubling his eye.  The chisel fell overboard shortly after the accident.  I still have the maul."

On the trial he testified about repairing the boat with Hendrickson and that he gave orders to him: " Q. Did you need any tools to do that?   A. Such as we had, an old bar and hammer and the axe and the like of that.   Q. What kind of tools did you need?   A. A splitting bar and maul.   Q. Did you get the tools?   A. Well, the tools actually belonged to Mr. Rice, they were harbored on my boat in my box, on the deck of the boat.   *  *  *   Q. Where did the tools come from, Mr. Seering?   A. They had them always hanging around them boats.   Q. Are they your tools?   A. No, sir.   Q. What do you mean by that — they had been hanging around the boats?   A. They had been shifted from boat to boat.   Q. In that yard?   A. Time and time again.  No, not in that yard.   They had been down the foot of Fourth street, Brooklyn, and went to New York and all over.   *  *  *   Q. When you say all over on the work what do you mean?   A. Whenever he had boats, where he had the privilege to hang up his boats, that was where the tools were.  *  *  * Q. Were there any other tools furnished by Jacob Rice & Sons except those in this box?   A. Oh yes, they supplied a big store and

something else which was generally used. Q. Was there any other splitting bar except this one? A. No, sir. Q. Now, did you get a splitting bar? A. I got it, yes, sir. Q. And you got it from this box on your boat? A. Yes. Q. How big was the maul that you got? A. About 6 or 7 lbs. Q. Now then, will you describe the bar that you got? A. Well, it was a piece of octagon steel, looks like some kind of a drill made to a chisel * * * about 18 inches long, * * * flattened out on one end and is a chisel on the other end where the edge was. * * * Q. How did the top — where you hit — how did it look? A. On the top of it was grooves and pieces broke out. * * * Q. Now, when you got that bar and you went to this place on the scow where you wanted to do the work, what did you do and what did you tell Mr. Hendrickson to do? A. I took the bar and held it at the place and told him to strike it with the maul. Q. Did he strike it with the maul? A. He struck it about 3 or 4 different times and then he complained he had something in his eye. * * * I examined the bar and I examined the hammer Q. Did you see anything wrong about the hammer? A. No, sir. Q. When you examined the end of the bar what did you find there? A. It had been a piece broke out of it. Q. You found a piece had been broken out. After that did Hendrickson go away? A. Hendrickson went to the doctor, to the hospital rather. Q. He never worked for you again? A. No."

Cross-examination: " Q. You kept that chisel in your boat, didn't you? A. It was on my boat while we laid there, the tools was on my boat. Q. You owned the chisel? A. No, sir. Q. Are you quite sure you did not own it? A. I perfectly well know I did not own that chisel. Q. Did you ever tell any one you did not own that chisel? A. No, sir. Q. What became of that chisel? A. God knows, I don't. Q. What became of that chisel? A. I don't know; it fell overboard, I think. Q. About a week after? A. Maybe longer than a week. Q. You used it a few times and it fell overboard when you were using it after this, you have already told that to us? A. Yes. * * * Q. Did you ever tell any one, Mr. Seering, that the top of that bar was perfectly smooth; the top was smooth, wasn't it, before Hendrickson started to hammer? A. It was smooth in a way. It was worn like — it was smooth in a way. * * * Q. You had used it yourself before? A. Used it whenever they needed it before. Q. Are you quite sure that Hendrickson was not using this chisel alone at the time? A. He couldn't use it alone at the time Mister, because I had it in my hand and he was hitting it."

Then he was shown a statement and said: " Yes, sir, this is

my handwriting." He said: " I signed a statement up on the boat after Hendrickson was hurt, * * * right after the accident. * * * Q. Now, in this statement it is claimed that you said that the tools belonged to you and that you bought them three months before? A. Judge, your Honor (standing). Q. Sit down, please. A. How can you expect — Q. You must not argue with the court. You are here to answer questions. We want the truth. Did the tools belong to you or didn't they? A. No, they belonged to Mr. Rice. Q. Did you tell any one that they belonged to you? A. No. Q. You never did? A. No. Q. Did you ever tell any one that the tools belonged to you? A. Did I tell them, no."

The tools used were simple. There is no satisfactory evidence that they were owned or furnished by the defendant. Indeed, the weight of the evidence is that they were not, that Seering produced them of his own accord from his own boat and that he owned them. The two experienced barge captains were doing this work in their own way, without specific instructions. While there may be a question of fact presented, the evidence is so unsatisfactory and contradictory that we are of the opinion that this verdict should not stand. It also appears that there were plenty of proper tools in the yard.

The judgment appealed from should be reversed as against the weight of evidence and a new trial granted, with costs to the appellant to abide the event.

MERRELL, FINCH and MARTIN, JJ., concur.

Judgment reversed and new trial granted, with costs to the appellant to abide the event.